**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PETRON SCIENTECH, INC., et. al., | Civil Action No.: 11-7122 (PGS) |
| Plaintiffs, | |
| v. | **MEMORANDUM & ORDER** |
| RONALD P. ZAPLATEL, POROCEL INTERNATIONAL LLC, USA and ALUCHEM INC., A/K/A "THE ALUCHEM GROUP" or "THE ALUCHEM GROUP OF COMPANIES" | |
| Defendants. | |

SHERIDAN, U.S.D.J.

This matter is before the Court on  Defendants' motion to dismiss under Rule 12(b)(2) and 12(b)(6) (ECF No. 6).

This matter arises out of a business relationship between Plaintiffs Yogendra Sarin ("Sarin") and Petron Scientech, Inc. ("Petron"), and Defendants Ronald P. Zaplatel ("Zaplatel"),  AluChem, Inc. ("AluChem") and Porocel International, LLC, USA ("Porocel").  Sarin is the President of Petron, and Zaplatel is the President, CEO and a shareholder of both AluChem and Porocel.  The Complaint alleges that beginning in April 2011, Zaplatel, individually and in his capacity as President and CEO of AluChem and Porocel, began to repudiate past promises and representations made by him over the course of the parties' five year business relationship.  This matter is before this Court on Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) and (6).  Defendants argue that while the Court does have jurisdiction over AluChem, Zaplatel and Porocel do not have

sufficient contacts with the State of New Jersey in order to be subject to personal jurisdiction here, and that even if there is jurisdiction over those parties, the Complaint fails to state a claim against any of the Defendants.  For the reasons stated below, Defendants' motion to dismiss is denied.

## I.    FACTS

### A.    Introduction

The following facts are as stated in the Complaint, and in Plaintiffs' opposition to Defendants' motion to dismiss for lack of jurisdiction wherein Plaintiff asserted additional facts related to the Defendants' contacts with the State of New Jersey.  Plaintiffs supported their opposition with an affidavit made by Plaintiff Sarin and a certification by counsel.

The Defendants are Zaplatel, AluChem and Porocel.  AluChem was founded in 1978, by Zaplatel along with two partners.  AluChem produces refined minerals and chemicals.  Compl. ¶¶ 4,7.  AluChem is headquartered in Ohio but has offices in several other states, including in Salem, NJ.  AluChem owns property in New Jersey, and concedes personal jurisdiction here.

In 1996, the three AluChem shareholders, including Zaplatel, purchased Porocel.  *Id.* ¶ 10.  Thus, the two corporations have common owners.  Kist Decl. ¶ 6.  Porocel is headquartered in Little Rock, Arkansas, and has offices located in at least five other places around the world, although Porocel does not have any property or offices in New Jersey.  *Id.* ¶ 8; Compl. ¶ 3.  Zaplatel resides in Colorado, and is President and CEO of both AluChem and Porocel.  The two corporations also share a CFO and Vice President.  Kist Decl. ¶ 1.

Sarin is a Shareholder, Director and President of Petron, which he formed in 1991.  Sarin Aff. ¶ 2-3.  Petron is engaged in chemical process technology development and licensing as well as process catalyst research and development.  Sarin and Petron developed the technology process used

to convert ethanol to ethylene. This is an important "green" technology because it uses ethanol, a renewable resource, to make ethylene, a product traditionally made from depleting petroleum stocks. Petron is internationally known in the industry for its technology process and its project design engineering and project development services. *Id.* ¶¶ 3-6.

The parties' relationship began in 2005. Zaplatel first contacted Sarin for help in expanding AluChem and Porocel's activities. In 2006, Zaplatel approached Sarin about merging Petron's activities with AluChem and Porocel's activities. Compl. ¶¶ 12-13. Zaplatel told Sarin that he wanted to raise capital because he wanted to control the activities of AluChem and Porocel by buying out his other two partners. *Id.* ¶ 15. Zaplatel said that by including Petron's Green Technology Portfolio, he hoped that the package would be "sexier" and therefore more successful than Porocel and AluChem had previously been in attracting investors. *Id.* ¶ 17. Over the next several years, the parties had an ongoing relationship, which included at least three important parts that Plaintiffs point to in their Complaint: (1) a Letter of Intent issued by Zaplatel, on behalf of an entity called NewCo, to Petron in 2007; (2) a 2009 agreement between Zaplatel, on behalf of "the AluChem Group of Companies", and Sarin on behalf of Petron, to form a new company called GBCL; and (3) the Rosneft Project, a project to develop an oil refinery in Russia, that began in 2005 and continued on through the filing of this lawsuit.

Plaintiffs claim that throughout the parties' relationships, Zaplatel represented himself variously as the President and CEO of "AluChem, Inc.," the "AluChem Group," the "AluChem Group of Companies," of which Porocel was a part, and also "Porocel." Sarin Aff. ¶¶ 7-8, 70-71. As a general matter, Plaintiffs assert that, as a result of Zaplatel's interchangeable representation of himself over the years as an officer of AluChem, the AluChem Group of Companies, and Porocel,

3

all of Zaplatel's actions were taken individually and as an officer of each of the various business entities. *Id.* ¶¶ 70-72.  Plaintiffs also allege that numerous emails were sent to Sarin in New Jersey regarding the business relationship between the parties.  The Affidavit lists numerous emails in which Zaplatel used different titles (President and CEO of AluChem/Petron/GBCL or a combination of those companies) regardless of the subject matter of the emails.  *Id.* ¶¶ 53-69.

### B.    The Letter of Intent

On June 20, 2007, Zaplatel signed a Letter of Intent (the "LOI") dated June 19, 2007, whereby Zaplatel, on behalf of NewCo, a new company that was to be formed under the agreement, agreed to acquire Petron and its technologies, expertise, assets, and liabilities, including JV interests, for $25,000,000.  Zaplatel also agreed to merge Petron operations with AluChem and Porocel into NewCo.  The LOI anticipated a closing date of October 14, 2007.  The LOI also provided a management contract to be given to Sarin.  Compl. ¶ 18.  Zaplatel and AluChem conducted due diligence to verify Petron assets and in consideration of the exclusive rights given to them and for the efforts made by Petron to provide information to them to assist the due diligence, Petron made a down payment in the amount of $100,000 which was secured by a non-interest bearing Promissory Note.  *Id.* ¶ 20.  Sarin and Zaplatel negotiated the LOI in Princeton, New Jersey.  Sarin signed the LOI in New Jersey, and Zaplatel executed it in Canada.  Sarin Aff. ¶ 10.

The proposed closing date in the LOI passed without a closing on the transfer of assets from Petron to NewCo.  Plaintiffs and Defendants, however, continued to work together and maintain a business relationship whereby Sarin and Petron gave to Zaplatel and AluChem a worldwide, exclusive license to market Petron's Green Technology Portfolio in tandem with AluChem's resources to build Green Technology production plants.  Compl. ¶ 21.  Over the next few years, at

4

the request of Zaplatel and AluChem, Sarin and Petron hired specialists at considerable cost, and spent time and resources, in promoting the concept that AluChem would build processing plants that would use Petron's Green Technology Portfolio. *Id.* ¶ 22.

### C.     The GBCL Agreement

On May 11, 2009, the parties entered into a different agreement in writing (the "GBCL Agreement"). This Agreement was negotiated by Zaplatel during at least one visit to Princeton, New Jersey. The GBCL Agreement was also signed by Sarin in New Jersey; Zaplatel signed it via email from another location. Plaintiffs contend that this was a modification of the LOI, however Defendants argue that this was a separate and unrelated agreement. In lieu of the purchase and sale of assets initially contemplated in the LOI, Zaplatel, on behalf of the "AluChem Group of Companies," and Sarin, on behalf of Petron, entered into a joint venture whereby Zaplatel was to obtain funding and Petron was to provide the Green Technology Portfolio and Engineering Design and Development Services.

Under the terms of the GBCL Agreement, the AluChem Group of companies, of which Plaintiffs claims Porocel is a part, initiated the formalities of creating, under the laws of the State of Delaware, a new entity called Green Biochemicals, LLC ("GBCL"). Petron owned fifty percent of GBCL, and the AluChem Group owned the remaining fifty percent. *Id.* ¶ 24. Pursuant to the agreement, GBCL would compensate Petron with a lump sum, non-recourse, non-refundable payment of $1,000,000 for the worldwide exclusive license to the Green Technology Portfolio that Aluchem had enjoyed for the previous two years. In addition, the Note from Petron to Zaplatel was retired. *Id.* ¶ 25.

Plaintiffs contend that Zaplatel's and AluChem's obligations under the GBCL Agreement

were to make the non-recourse, non-refundable payment and to raise $2.5 million to fund GBCL. *Id.* ¶ 27. However, although the GBCL Agreement was signed by Zaplatel on behalf of the "AluChem Group of Companies", the Agreement says *that GBCL* would make the payment to Petron, and that Zaplatel, "as CEO of GBCL" would raise $2.5 million in funding. Zaplatel and Aluchem were repeatedly reminded by Plaintiffs of their alleged duty to arrange the funding and make the payment, and they continually promised to do so. Plaintiffs relied on these promises to their detriment. *Id.* ¶¶ 28-29. Plaintiffs now allege that Zaplatel and AluChem violated the GBCL Agreement by failing and refusing to provide any funding to GBCL, by not providing the $1,000,000 payment to Petron, and by not providing yearly compensation to Sarin.

Plaintiffs also allege that Zaplatel and AluChem unilaterally and without authorization advised several potential key customers that Petron's Green Technology Portfolio was not available for Petron to license. This allegedly caused Petron to lose licensing and business opportunities, engineering fees, reputation with potential key customers, and significant income. At the time of the filing of the Complaint, Zaplatel and AluChem allegedly continued to make financial presentations to various investors highlighting the value of the Green Technology Portfolio and projecting the technology as a multi-billion dollar potential available through AluChem. *Id.* ¶¶ 29-35. The GBCL Agreement contains a clause that allows Petron to cancel the contract "if GBCL is unable to complete a funding for the first project or is unable to provide Petron $1 million for upfront technology development and project support fee within 18 months from signing date." The Complaint does not allege that Plaintiffs ever cancelled the Agreement or withdrew the license granted to GBCL.

The Complaint alleges that at least three GBCL-related meetings attended by Zaplatel took

6

place in Princeton, New Jersey over the years:  (1) an August 25, 2009 meeting in Princeton, at which the parties negotiated the GCBL Agreement; (2) an October 29, 2010 GBCL business meeting in Princeton, New Jersey; and (3) an August 24, 2011 GBCL business meeting in Princeton[1].  Sarin Aff. ¶¶ 24-29.

### D.     The Rosneft Project

Rosneft is one of the largest oil refining companies in Russia.  Rosneft approached Porocel about setting up a facility for Rosneft (the "Rosneft Project").  Porocel, through Zaplatel, approached Petron in 2005 to provide exclusive assistance in the development of the Rosneft Project.  Porocel and Zaplatel understood that without the expertise and reputation of Petron, Porocel would have no credibility with the Rosneft executives and would not have been able to secure the Rosneft Project contract.  Petron had extensive experience in designing and building complex projects in Russia, including being fully familiar with the local design institutes as well as the engineering and design codes and standards applicable in Russia, commonly known as GOST standards.  Porocel had no experience in developing complex projects on its own, nor did it have familiarity with GOST standards.  Porocel also has no experience in developing the chemical and design engineering required to develop and build a catalyst regeneration plant.  *Id.* ¶¶ 36-42.

A catalyst regeneration plant operated and built by Porocel in Singapore was to serve as the platform for the design and construction of the Rosneft Project, but it was understood and agreed that the design would have to be substantially modified to meet GOST standards.  It was agreed that Porocel would make all of the design plans and specification for the Singapore plant available to

---

[1]     Defendants contend that this last meeting was held for the purpose of discussing a settlement of a separate lawsuit pending in Colorado between Zaplatel as an individual and Petron over the $100,000 Promissary Note issued to Zaplatel in connection with the LOI. Def. Br. at 10.

Petron in hard copy, and Petron was to develop the Process Scope of Work and provide detailed plan and design specification conforming to GOST standards. It was also understood and agreed that the equipment supply would be by Petron, on a transparent basis whereas the actual construction would be carried out by a Russian contractor employed by Rosneft.

At the express request of Zapletal, which Plaintiffs allege was on behalf of Porocel and AluChem, Petron provided extensive support and services to Porocel and AluChem for the complete and exclusive development of the Rosneft Project. Also at the express request of Zapletal, which Plaintiffs allege was on behalf of Porocel and AluChem, Petron engaged several catalyst and engineering specialists to work exclusively on the Rosneft Project. From 2009 through April 2011, Petron also provided support and services in numerous other ways, including: visits to Porocel plants to establish the basis of design for the new project; performing scoping study; development of design and engineering specification of the Rosneft Project according to GOST design standards; arranging and participating in Porocel's project meetings; drafting of technical and commercial contracts for the Rosneft Project on behalf of Porocel; presentation of Petron's experience and expertise in developing complex projects in Russia to Rosneft executives and designers; analyzing waste water disposal issues at Porocel's operating plants in Luxembourg; and participation in numerous email exchanges and telephone discussion pertaining to the development of the Rosneft Project. *Id.* ¶¶ 43-49.

Petron provided the engineering and other services to Porocel and AluChem for the Rosneft Project from its New Jersey Offices. The  documents provided by Petron to Porocel and AluChem were also created in New Jersey. *Id.* ¶ 21. Petron invoiced Porocel for work done in furtherance of the Rosneft Project. Both Porocel and AluChem made payments to Petron for the invoiced amounts

8

either by check to Petron's offices in New Jersey or by wire to Petron's bank account in New Jersey. Sarin Aff ¶¶ 54-69.

Zaplatel and his staff arranged meetings at "various hotels near Newark Airport and also in New York City" to continue work on the Rosneft Project. *Id.* ¶ 31. Zaplatel repeatedly represented to Petron that Porocel and AluChem would be working exclusively with Petron. On or about January 24, 2011, AluChem and Porocel advised Sarin and Petron that they were drafting a proposed agreement between Porocel and Petron (and a third party) that would mirror Porocel's obligation in its agreement with Rosneft. Porocel and the AluChem Group specifically stated to Sarin that: "This is what we had agreed to do and it will contain the key points . . . and more." As recently as April 2011, AluChem and Porocel met with Sarin to further the Rosneft Project[2]. Shortly thereafter, in April, 2011, Porocel informed Petron that, in order to save money, it was going to complete the Rosneft Project with a Singapore based company, MS Singapore, using all of Petron's work product from the previous several years. At the time the Complaint was filed, the only payments Porocel and AluChem made to Petron for its work in development of the Rosneft Project were for some initial cost estimate work and expenses. Compl. ¶¶ 50-53.

---

[2]     In Plaintiffs' Brief In Opposition To Motion To Dismiss (ECF No. 10-3), Plaintiff alleges facts regarding the Rosneft Project that were not alleged in the Complaint. Specifically, Plaintiff attaches a document, dated April 4, 2011, that Plaintiff alleges memorializes the terms of the contract for the Rosneft Project. When evaluating a motion to dismiss," courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of the claim." *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004). Because the April 4, 2011 document was not attached to nor referenced in the Complaint, the Court will not consider it or arguments that stem from it for the purposes of this motion to dismiss.

### E.     The Claims

Plaintiffs allege claims against Zaplatel, AluChem and Porocel for: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) tortious interference with economic benefit; (4) misrepresentation; and (5) conversion.

## II.     DISCUSSION

### A.     Personal Jurisdiction

### 1.     Legal Standard

Defendants assert that Zaplatel's and Porocel's contacts with the State of New Jersey are insufficient to provide a basis for the assertion of personal jurisdiction over them, and that therefore the claims against them should be dismissed pursuant to Fed. R. Civ. P. 12(b)(2).  A federal court sitting in diversity must conduct a two-step analysis to ascertain whether personal jurisdiction exists. First, the court must look to the forum state's long-arm statute to determine if personal jurisdiction is permitted over the defendant.  Second, the court must determine whether the exercise of jurisdiction violates Due Process of the Fourteenth Amendment. *See IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998); *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co.*, 75 F.3d 147, 150 (3d Cir. 1996).  In this forum, the inquiry is collapsed into a single step, because New Jersey's long arm statute permits the exercise of personal jurisdiction to the fullest limits of due process as defined under the Constitution of the United States.  As such, federal law defines the parameters of this Court's in personam jurisdiction. *See IMO Indus., Inc.*, 155 F.3d at 259.  The Fourteenth Amendment permits a state to exercise jurisdiction over an out-of-state defendant only where "the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King*

*Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235 (1958)).

It is the burden of the plaintiff to prove that the defendant has purposefully availed himself of the

forum state. *See Burke v. Ouartev*, 969 F. Supp. 921, 924 (D.N.J. 1997).

To prove that the defendant has purposefully availed itself of that state, a plaintiff may rely

upon a defendant's specific contacts with the forum state.  The burden to produce actual evidence

of the defendant's contacts with the forum state rests on the plaintiffs.  *See Time Share Vacation*

*Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 66 and n.9 (3d Cir. 1984).  Personal jurisdiction pursuant

to such contacts is known as specific jurisdiction. Specific jurisdiction is invoked when a claim is

related to or arises of out the defendant's contacts with the forum. *See Helicopteros Nacionales de*

*Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984); *Dollar Sav. Bank v. First Sec. Bank of Utah*, 746

F.2d 208, 211 (3d Cir. 1984).  A court must first determine whether the defendant had the minimum

contacts with the forum necessary for the defendant to have "reasonably anticipate[d] being haled

into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (citations

omitted). What constitutes minimum contacts varies with the "quality and nature of defendant's

activity." *Hanson*, 357 U.S. at 253.  In assessing the sufficiency of minimum contacts for personal

jurisdiction, the court must focus on the "relationship among the defendant, the forum, and the

litigation." *Keeton v. Hustler*, 465 U.S. 770, 770 (1984). Otherwise stated, there must be at least "a

single deliberate contact" with the forum state that relates to the cause of action. *United States Golf*

*Ass'n v. United States Amateur Golf Ass'n,* 690 F.Supp. 317, 320 (D.N.J. 1988). The unilateral acts

of the plaintiff, however, will not amount to minimum contacts. *Helicopteros Nacionales de*

*Colombia, 466 U.S. at 414; Hansen*, 257 U.S. at 253.

Assuming minimum contacts have been established, a court may inquire whether "the

11

assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corporation v. Rudzewicz*, 471 U.S. 462,476(1985) (quoting *International Shoe Company v. Washington*, 326 U.S. 310, 320 (1945)). *See also Pennzoil Prod. Co. v. Colelli & Assoc. Inc.*, 149 F.3d 197, 201 (3d Cir.1998). For personal jurisdiction to comport with "fair play and substantial justice," it must be reasonable to require the defendant to defend the suit in the forum state. *World-Wide Volkswagen. Corp. v. Woodson*, 444 U.S. 286, 292 (1980). To determine reasonableness, a court considers the following factors: the burden on the defendant, the forum state''s interest in adjudicating the dispute, the plaintiffs interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering substantive social policies. *Id.* Only in "rare cases [do the] 'minimum requirements inherent in the concept of "fair play and substantial justice" . . . defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities.'" *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County*, 480 U.S. 102, 116 (1987).

Courts may also exercise general jurisdiction over the defendant if the defendant has maintained "continuous and systematic" contacts with the forum state. *Helicopteros Nacionales de Colombia*, 466 U.S. at 416. To establish general jurisdiction the plaintiff "must show significantly more than mere minimum contacts" with the forum state. *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (Cir.1987). Moreover, the facts required to establish general jurisdiction must be "extensive and persuasive." *Reliance Steel Prods. v. Watson. Ess. Marshall*, 675 F.2d 587, 589 (3d Cir. 1982).

### 2.     Porocel's Contacts

Here, Plaintiffs allege facts sufficient to establish a basis for personal jurisdiction over Porocel in New Jersey.  Among others, Plaintiffs allege Porocel had the following contacts with New Jersey: (1) Zaplatel, Porocel's President and CEO, and shareholder, approached Petron and Sarin, New Jersey residents, and engaged in extensive discussions over the years by email, telephone, and in person, about the possibility of merging Petron and Porocel; (2) the LOI, which was executed by Zaplatel on behalf of "NewCo", but which created duties involving Porocel, was executed by Sarin and negotiated by Zaplatel, Porocel's President, CEO and shareholder, in New Jersey; and (3) Porocel's ongoing relationship with Petron and Sarin entailed Petron, a New Jersey corporation, providing to Porocel engineering, documents, payments, and other services from its New Jersey Offices, and entailed business meetings at hotels near Newark Airport and neighboring areas to work on the Rosneft Project[3].

### 3.     Zaplatel's Contacts

Plaintiffs also allege facts sufficient to establish a basis for personal jurisdiction over Zaplatel.  Zaplatel's contacts with New Jersey include at least four visits to New Jersey for meetings with Sarin, three of which were related to the GBCL Agreement, and one related to the  LOI.  Zaplatel also had extensive contact with Sarin and Petron over the years by telephone, email and in person, identifying himself as an individual and as representatives of various business entities

---

[3]     In Plaintiffs' Memorandum Opposing Motion to Dismiss, Plaintiffs make additional assertions about Porocel's contacts with New Jersey, including that Porocel is registered to do business in New Jersey, that it owns property in New Jersey, that it has an office in New Jersey, that it has a manufacturing plant in New Jersey, that it has employees in New Jersey, that it pays taxes in New Jersey, and that it sells products to New Jersey companies. These assertions are based on the certification of Plaintiffs' counsel.  However, none of these assertions seem to be accurate when the evidence supporting them is considered.  Therefore, this Court will not consider these contacts in deciding the motion to dismiss for lack of jurisdiction.

13

wishing to do business with Petron.  Zaplatel also acted as and represented himself as possessing the exclusive license to market the technology of Petron, a New Jersey corporation; Zaplatel, individually and on behalf of AluChem, was granted the worldwide exclusive license to market Petron's technology before the execution of the GBCL Agreement, and after that agreement Zaplatel represented to parties that Petron's technology was only available through AluChem.

### 4.   Analysis

Under these circumstances, a finding of personal jurisdiction over both Porocel and Zaplatel is appropriate.  Neither of the Defendants' contacts with New Jersey are so "continuous and systematic" as to warrant a finding of general jurisdiction.  Both of the Defendants, though, did have sufficient contacts with the forum state to warrant a finding of specific jurisdiction, and the dispute between the parties is related to and arose out of those contacts.  A contract may provide a basis for the exercise of personal jurisdiction that meets due process standards, but a contract alone does not "automatically establish sufficient minimum contacts in the other party's home forum . . . ." *Burger King*, 471 U.S. at 478.  Courts must also look to "prior negotiations and contemplated future consequences." *Id.* at 479.  Mail and telephone communications sent by the defendant into the forum may also count toward the minimum contacts that support jurisdiction. *Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 701 (3d Cir. 1990).

The Third Circuit has consistently held that contract negotiations with forum residents can empower a court to exercise personal jurisdiction over persons outside the forum.  In *Carteret Savings Bank, FA v. Shushan*, 954 F.2d 141, 147-48 (3d Cir.), *cert. denied*, 121 L. Ed. 2d 29, 113 S. Ct. 61 (1992), the Third Circuit held that telephone calls and correspondence sent into New Jersey from Louisiana by the representative of a Louisiana real estate developer, coupled with a meeting

in New Jersey to facilitate the closing of a loan provided the minimum contacts needed to satisfy due process. *Id.* (citing *Lebel v. Everglades Marina, Inc.*, 115 N.J. 317, 558 A.2d 1252, 1256 (N.J. 1989) (personal jurisdiction where only transactional contacts consisted of telephone calls and mailing of sales agreement)); *see also Taylor v. Phelan*, 912 F.2d 429, 433 n.4 (10th Cir. 1990) ("So long as it creates a substantial connection, even a single telephone call into the forum state can support jurisdiction."), *cert. denied*, 112 L. Ed. 2d 849, 111 S. Ct. 786 (1991).  Here, Porocel and Zaplatel both engaged in contract negotiations and other business communications with the Plaintiffs in New Jersey, and representations made during those negotiations and communications form the basis of the claims in the Complaint.  Representatives of Porocel, and Zaplatel himself, made repeated trips into the forum state for meetings about their relationship to and work with New Jersey residents.  Moreover, the contracts and business relationships at issue in the Complaint involved work being done by New Jersey residents, in New Jersey, and involved payments being made by Defendants to New Jersey residents in New Jersey.

The conclusion that Plaintiffs have established sufficient contacts between Zaplatel and New Jersey to subject him to this Court's jurisdiction, is proper even though many of those contacts were made by Zaplatel in his role as an officer of Porocel and AluChem.  In *Educational Testing Service v. Katzman*, the court held that actions taken by an individual within New Jersey in his "corporate capacity" may be imputed to a defendant corporate officer individually.  631 F. Supp. 550, 556 (D.N.J. 1986).  The Court noted that "[i]t would be anomalous, and would defeat the purposes of the law creating substantive liability, to permit a corporate officer to shield himself from jurisdiction by means of the corporate entity, when he could not interpose the same shield as a defense against substantive liability." *Id.* (quoting *Donner v. Tams-Witmark Music Library, Inc.*, 480 F. Supp. 1229,

1234 (E.D. Pa. 1979); see also *Acteon, Inc. v. Vista Dental Products*, 2006 U.S. Dist. LEXIS 27584, at *12-14 (D.N.J. May 3, 2006).  Zaplatel, as President, CEO, and shareholder of Porocel and AluChem, was directly involved with the negotiations of the LOI, the GBCL Agreement, and the Rosneft Project, including direct negotiations in person in New Jersey and "hundreds" of emails to Plaintiffs in New Jersey.  The basis of Plaintiffs' claims derives from the representations made by Zaplatel during such negotiations and communications.  As such, Plaintiff has properly plead a basis for specific jurisdiction over both Zaplatel and Porocel.

Finally, this Court must consider whether the exercise of personal jurisdiction "comport[s] with fair play and substantial justice."  The Defendants have not put forth any circumstances that would render jurisdiction in New Jersey particularly burdensome, nor have they offered an alternative forum that would be more fair to them.  The Defendants are sophisticated corporations with offices around the country and world, and their officer has traveled to New Jersey for business numerous times.  As for New Jersey's interest in adjudicating the dispute, "the state of New Jersey ha[s] an interest in protecting New Jersey residents against potential fraud or misrepresentations in business transactions." See *Panella v. O'Brien*, 2006 U.S. Dist. LEXIS 59880, at *15 (D.N.J. 2006).  In addition, because the claims against Zaplatel and Porocel involve the identical set of facts as those against AluChem, it would be in the interest of judicial economy to avoid dismissal of those two Defendants, thereby avoiding two simultaneous lawsuits on identical claims.  The exercise of personal jurisdiction over Zaplatel and Porocel in New Jersey therefore comports with fair play and substantial justice.

B.      **Failure to State a Claim**

1.      **Legal Standard**

On a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court is required to accept as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See, e.g.*, *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir. 1994).  A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *Iqbal*, 129 S. Ct. at 1950.  The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000), *cert. denied, Forbes v. Semerenko*, 531 U.S. 1149, 121 S.Ct. 1091 (2001).  While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Iqbal*, 129 S. Ct. at 1949;  *Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir.1997).  "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" *Kost v. Kozakewicz*, 1 F.3d 176, 183 (3d Cir.1993) (quoting 5A Wright & Miller, Fed. Practice & Procedure: Civil 2d § 1357 at 340).  The Supreme Court has recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, . . . .  Factual allegations must be enough to raise a

17

right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact), . . . ." *Twombly*, 550 U.S. at 555 (internal citations and quotations omitted); *see also Iqbal*, 129 S. Ct. at 1949-50.

### 2.      Contract Claims (Counts 1-4)

To state a claim for breach of contract, a party must show that (1) a valid contract exists between the plaintiff and the defendant, (2) the defendant breached the contract, and (3) the plaintiff incurred damages as a result of the breach. *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 275 F. Supp. 2d 543, 566 (D.N.J. 2003).  Here, each of the Defendants is alleged to have entered into a business relationship with the Plaintiffs, including an oral or written agreement with the Plaintiffs. In addition, Plaintiffs have alleged evidence of Defendants' repudiations of past statements and of Defendants' breach of the agreements between the parties, and have alleged that those repudiations and breaches caused damages.  Assuming that the allegations in the Complaint are true, Plaintiffs have adequately plead breach of contract claims.

In addition, every contract in New Jersey carries within it an implied covenant of good faith and fair dealing.  "In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Sons of Thunder v. Borden, Inc.*, 148 N.J. 396, 420 (N.J. 1997) (internal citations and quotations omitted).  Defendants' motion to dismiss does not challenge the viability of the implied covenant of good faith and fair dealing claims other than saying they are dependent on the existence of enforceable contracts, and the Court finds that Plaintiffs – in alleging that Defendants repudiated its past promises – have made a sufficient showing that Defendants destroyed Plaintiffs' rights to receive the fruits of the parties' contracts.  Accordingly, Defendants' motion to dismiss

Counts one through four is denied.

### 3.    Interference Claims (Counts 5-6)

In *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751-52, 563 A.2d 31, 37 (1989), the Supreme Court of New Jersey followed a four part test to evaluate a tortious interference claim; Plaintiffs must allege: (1) the existence of some protectable right – a prospective economic or contractual relationship; (2) facts claiming that the interference was done intentionally and with "malice", "malice" being defined to mean that the harm was inflicted intentionally and without justification or excuse; (3) facts leading up to the conclusion that interference caused the loss of the prospective gain, meaning, plaintiffs must show that had there been no interference, there is a reasonable probability that plaintiff would have received the anticipated economic benefit, and (4) that the injury has or will cause damage.  "It is 'fundamental' to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship." *Id.* Here, among other things, Plaintiffs allege that Zaplatel unilaterally and without authorization advised several potential key customers that Petron's Green Technology Portfolio was not available for Petron to license.  This allegedly caused Petron to lose licensing and business opportunities, engineering fees, reputation with potential key customers, and significant income. Accordingly, Defendants' motion to dismiss Counts five and six is denied.

### 4.    Misrepresentation Claims (Counts 7-8)

"Under New Jersey common law, persons who negligently misrepresent material facts may be held liable to those who, as a result of their justifiable reliance on such misrepresentation, suffer economic harm." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 289 (3d Cir. N.J. 1992) (citing *H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 461 A.2d 138, 142-43 (N.J. 1983)).  Plaintiffs have

sufficiently alleged that Defendants made material representations, that the misrepresentations were relied on by the Plaintiff, and that as a result of the reliance Plaintiffs suffered damages. Accordingly, Defendants' motion to dismiss Counts seven and eight is denied.

### 5.    Conversion Claims (Counts 9-10)

Under New Jersey Law, "[c]onversion is essentially the wrongful exercise of dominion and control over the property of another in a manner inconsistent with the other person's rights in that property." *Peloro v. United States*, 488 F.3d 163, 173-74 (3d Cir. 2007) (alteration in original) (citations omitted).  Plaintiffs fail to respond to Defendants' argument that the conversion claims should be dismissed.  Plaintiffs also fail to explain how Defendants' actions constitute conversion and fail to even point to the specific property that has allegedly been converted.  Accordingly, Defendants' motion to dismiss Counts nine and ten is granted.

### ORDER

For the reasons stated set forth above, Defendants' motion to dismiss is denied in part and granted in part

IT IS on this 18th  day of October, 2012;

ORDERED that motion to dismiss for lack of personal jurisdiction is denied; and it is further

ORDERED that motion to dismiss for failure to state a claim is denied as to Counts One through Eight, and granted as to Counts Nine and Ten.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.